The last case on the argument calendar is Joseph Dow v. Karen Dow v. BLC Bank, S.A.L. All right, we have Mr. Major arguing for the appellants. Mr. Major, I see you have reserved three minutes for rebuttal, and you can begin whenever you're ready. Thank you. Good morning, Your Honors. Chris Major, and I'm joined by my colleague, Amit Scherzer. We represent the plaintiff appellants, Joseph Dow and Karen Dow. May it please the Court, the district court below erred in holding that it did not have personal jurisdiction over C.L. Bank. The reason the district court had personal jurisdiction over C.L. Bank is its purposeful use of its New York correspondent bank accounts in connection with the claim that the Dows are making. But the second prong, the second requirement for personal jurisdiction is that the claim asserted must arise from that business activity. So why was the district court incorrect in concluding whatever money flowed, the wire transactions, four of them, actually there was one, A.M. had none, but putting that aside for a minute. Years earlier, money flows into these correspondent accounts, but your claim, you can correct me if I'm wrong, your claim is when in 2020, when they want to get U.S. dollars out of the banks, they're told that they can't. And that has nothing to do, you can correct me if I'm wrong, with the earlier activity, right? Your Honor, when they were told in 2019 that they would in fact receive the transfers, they were told that they would be transfers through the New York correspondent banks. And in the case of C.L., C.L. represented to the Dows that we will even make a transfer issue. Why do you have a claim against A.M.? A.M. had no, you're making the same claim against A.M., correct me if I'm wrong, right? Are you making the same claim against A.M.? A.M. induced the deposit at A.M. Bank by promising shortly after the new year in 2020 to use its New York correspondent bank to wire the money to the Dows. The correspondent banks, and this is laid out in Joseph Dow's declaration, was critical to the banking relationship, both to the initial deposit and to the inducement to retain the deposits over time. And it was a mechanism by which these banks would have delivered the funds as they were legally required to do so. So the claim arises from the transaction that wasn't done through the correspondent bank in New York? It arises through the entire relationship and the dependence of the relationship on the correspondent banks. The arise from is a permissive standard under Leachy. It is not a causation standard. It just has some relatedness to the Dow's claim. You're saying they were specifically told that the U.S. dollars they would get would come out of the correspondent bank accounts? That's part of your claim? Yes, Your Honor. And Mr. Dow lays this out in his declaration that was before the district court, that he was promised that one of the reasons that these banks are a good bank for him to use is because of their ability to transfer U.S. dollars quickly because they had the correspondent banks. And we put this in the record and we briefed this. These banks, Your Honor, if you go on, in particular, one of the banks, I think it's BLC, if you go on the website, they list these big New York banks to show how legitimate the Lebanese banks are. And they even fly little American flags next to them. For overseas banking, using these New York correspondent banks is key to establish credibility. They're leaning on the New York financial system to draw depositors like Mr. and Mrs. Dow. And what about AM? How do you have personal jurisdiction over AM? AM induced the deposit in December of 2019 by promising specifically to use its correspondent bank in New York to wire the funds to the Dows in early January of 2020. That inducement, they used their correspondent bank, they maintained it, which the defendants argued it's not enough to maintain it. We're not saying it's just maintenance. It's purposeful use and reliance on that New York correspondent bank in order to induce deposits and also to make transactions. And take, in the case of C.L. Bank. But just going back to Judge Lynch's points, your argument with respect to AM is that it's their purposeful non-use of that, not their purposeful use. They didn't use it. They never used it. Yes, Your Honor. But remember, it's not a causation standard. And because it's not a causation standard, I don't think on the record below the district court could have said there was no relatedness to use the language. So wouldn't it be the same thing if they didn't even have the correspondent relationship? If they just fraudulently claimed that they had a correspondent relationship with the New York bank and they would use that to send money, when they never intended to do that and they never had the relationship, that would be the same sort of use, right? I don't think so, Your Honor. I mean, under the facts here, certainly they did have a New York correspondent bank. Yeah, but I'm saying the representation, I'm going to do something through a New York bank that's a false representation. Or maybe it's not a false representation. Maybe they intended to do it at one time and then they changed their mind later. It's still hard for me to see how that says that your claim has anything really to do with the New York banking relationship. It has to do with the fact that they declined to do, refused to do, failed to do something that they were legally obligated to do. That's your claim. I don't see what that has to do. That all arises from decisions taken in Lebanon. I think, Your Honor, that the difference with your hypothetical is the case law talks about maintenance and use. And so in your hypothetical, there wouldn't be maintenance. It would just be a fraudulent representation made in Lebanon. But this bank does, in fact, own bank accounts at large New York banks. And therefore, you do have the maintenance piece and then it used, through its misrepresentation, the idea that it would transfer these dollars back to the DAOs on U.S. shore through those New York accounts. I think that would be the difference in the hypothetical. In terms of the due process piece of personal jurisdiction, as this Court held after the certified question, Leachy, it's a rare case that one could imagine where the due process could serve wouldn't be satisfied, where you have large banking institutions banking at some of the biggest banks in the world here in New York. They bank in connection with or in a related matter with the claim in the case. And they also, on top of that, avail themselves of these New York banks for transactions every single day. I think the due process prong is satisfied. In terms, Your Honors, of the form selection clauses, this is one of the rare cases where the Court should disregard the form selection clause in two of the banks, BLC and AM, because of the conditions in the Lebanese courts and because of the danger that the DAOs could face if they were to travel to Lebanon. I thought they didn't have to travel there. I thought that, isn't there information in the records suggesting that under Lebanese law, their lawyers can do that for them? Your Honor, we put in expert testimony, and it's in our brief, that the Lebanese court could at any time, particularly in a case like this where Mr. Dow has made assertions about statements that bankers made to him, that they could summon him for what they refer to as confrontation. And that's quoted in our expert declaration. So he could be called as a witness. He wouldn't have to go there to initiate litigation. You're saying because he's a critical witness in the case, he would have to go there, essentially. He could be called to go there and testify if he were to initiate a case. And we've outlined the reasons why the DAOs would be in danger. We've given an example. The district court said, I recognize the seriousness of the example, which, by the way, was credited by a court in Florida, a district court in Florida, after an evidentiary hearing, where a woman was kidnapped upon landing because she initiated a lawsuit. And what the district court said below was, well, you haven't shown that's what's going to happen to you. So that would mean I would have to tell my clients, get on a plane and fly over there. And if something happens, we can get back into the district court. Well, hang on. That's not necessarily true, right? I mean, anecdotal evidence that something happened to one person once, a court can say, that's not enough to show it's likely to happen to you. That's not necessarily saying, I need proof positive that it's going to happen to you. I mean, we do this in asylum cases all the time, right? We're not saying that we require moral certainty that you personally are going to get, this is something that's going to happen. But you do have to show some circumstantial evidence that's going to happen to you, more than just it happened once to one other person. I agree with you, Your Honor. But what the district court also had before it were statements in Mr. Dow's declaration that his family members had received threats. And he has received a threat from a longtime friend, who's a general in the Interior Defense Department, who said, you can't come back here. How is that a threat? Your Honor. I thought it was someone warning you, I don't think you should come back. I think it's dangerous. That was a message from someone friendly, thinking his danger assessment, that's not a threat, right? The friend was not threatening him or conveying a threat from a third party, was he? Or am I misremembering? As to that one, Your Honor, you're exactly right. It was the former general of the Interior Defense Department said, don't come back here, I wouldn't be able to protect you. That's a pretty, it may not be a threat from the... Putting aside that, were there threats conveyed to them? Mr. Dow's family has been told, what is he doing? You know it's not safe for him back here. The statements, Your Honor, are in Mr. Dow's declaration. Right, and I thought those were all sort of friendly warnings from people who were sympathetic to them, saying, hey, I don't think you should come back here, this doesn't seem safe. My question to you is a separate one. Were there threats communicated to them? Your Honor, not directly by the parties who were communicating... Or indirectly. But who would, when threats are made, they often are done in a veiled way, Your Honor. And I think there's enough with the threats that have been relayed to them, or the concerns that have been relayed to them, based on conversations that are happening in Lebanon, coupled with a former defense minister, or general in the Interior Defense Department, that that is sufficient. Another thing I want to really emphasize, though, Your Honors, is we put in expert testimony that even if they were to take the risk of traveling to Lebanon to litigate, they have no remedy. Our experts checked all of the cases that have been filed, and there aren't U.S. dollar transfers. I'm aware of two cases, one in France, one in England, where there are actually orders of wire transfers out of the country. So that testimony to me, independent of the threat... What about the fact that they opened accounts in 2019? Aren't they, by doing so, showing that they are continuing to subject themselves to the laws of Lebanon, even after all these issues regarding the banks have arisen? What's your response to that? Your Honor, at that time, the money had already been frozen. They had already struck out in numerous attempts to get the wire transfers. Exactly. And then they go and deposit more money. It was money that was already in Lebanon, Your Honor. It was money that was already frozen. It's not like they onshored new money at that point in time. So it wasn't the same situation. Let me ask you, with the time you have left, just to address the BDL. Yes, Your Honor. So let me just focus you, at least what my question is on that. Obviously, you have to show that that bank's conduct had a direct effect in the United States. Yes, Your Honor. And you correct me if I'm wrong. Obviously, they had no contractual relationship with your clients. They made no representations to your clients. So how does that bank's conduct have a direct effect in the United States? Your Honor, the checks. The checks create an independent obligation. The district court found below... That bank doesn't... When they issue those checks, they don't know where those checks are going to be. They could be cashed anywhere, right? They're not destined for the United States of America, right? Your Honor, these were cashier's checks. They were cashier's checks. That was represented to Mr. Dow that he would receive cashier's checks. We put in the complaint below that... When BDL gives these checks to the commercial banks, they could go anywhere, right? Your Honor, but because they're cashier's checks, BDL is both the drawer and the droyee. And that's what the U.S. banks... How the U.S. banks characterize them. So they're obligated on the checks. Their conduct in issuing a check to a commercial bank has to have a direct effect on the United States. And we've had cases over and over say that if there's no contractual relationship... Obviously, if there's a contractual relationship, the pay in the United States is completely different. But we have said on more than one occasion that there is no direct effect, where repayment of a debt or obligation that it be made in New York or the United States. And clearly, there was no obligation that those checks drawn on that bank be cashed in the United States, right? Your Honor, the difference is if Citibank issues me a checkbook and I then write checks out of my account. Here, what we've alleged in the complaint, what was told to Mr. Dow, which the U.S. banks at A662, A663, A665 confirmed, is that BDL was the drawer and the droyee. So it's like me going into Citibank and saying, take $5,000 out of my account and give me a cashier's check. Because the person I'm going to give it to doesn't want a personal check from me. They want a check from you. But Citibank has no idea what you're going to do with that check or where you're going to go with it, right? Exactly. So if you show up in Mongolia with that check, right, your idea is that now that's on Citibank and you could sue them in Mongolia? Your Honor. Because you just happened to go to Mongolia with the check? You can go anywhere where it's possible. Right. So that's what I'm saying. Assuming Mongolia has banks and bank tellers, you're saying on that theory, you could go to Mongolia and sue them if Mongolia says, no, we don't want these checks? We're suing under the Foreign Sovereign Immunities Act in the United States and it has a commercial activity exception which says if you do something overseas and it has a direct effect in the U.S. Yeah, I'm just trying to measure the direct effect. I know that Citibank is not a sovereign and all that. All I'm trying to do is measure your argument about the direct effect. And that's what I'm saying. You know, the hypothetical. Citibank, you take, you get a cashier's check. And the point is you can go anywhere. You show up in Mongolia, you're saying that there is a direct effect in Mongolia of the fact that Citibank is not honoring the check? If the, here though, Your Honor, the plaintiffs are U.S. citizens, residents of the U.S. and we're going to use the money in the U.S. But doesn't the check say on it that it's payable in Beirut? It says payable in Beirut because that's where the U.S. bank, which by the way, accepted the checks, the deposits were accepted. They were not rejected at the counter in the U.S. The U.S. banks then went to BDL to collect. And BDL said no. But we put an expert testimony that that was unlawful and that those checks are depositable anywhere in the world. And then it's a situation of the U.S., the international monetary system to get the collection. But the act that causes all the trouble is they, once again, they refuse to pay on the check. And by refusing to send the... Is that a commercial activity or is that a sovereign activity in support of their effort to keep dollar payments in the country? It's a commercial activity, Your Honor, because you look at what the activity is. You have a bank that is, has issued a cashier's check and it's been deposited... But it's the refusal that's the issue, not the issuance of the check. They didn't even issue a check. No one at the BDL says, we're filling in Dow as the customer, as the payee. The banks all represented to Mr. Dow that they were authorized to issue the checks to him, but they were drawn on BDL and drawn by BDL. The act by BDL of not sending the money when the U.S. banks requested it clearly had a direct effect in the U.S. So if your clients were in France and they made the request for the money, right, you would say in refusing to send the money to France, it had a direct effect on France, right? Is that what your argument would be? If your clients were physically in France when they asked for the money, we want this money to come to France, these U.S. dollars to come to France, you would say it's a direct effect on France, right? It's not just the fact that they were located at the time in the U.S., it's that they were doing U.S. real estate investments. They told the banks about it, which are documented... Oh, that's just downstream, right? That's consequential damages type things. That has... Your Honor... If the bank has to know why they want the money and what they're going to do with it, and that's going to add to the direct effect? No, Your Honor. I'm just trying to draw the distinction of just being located somewhere in the world and living, working, investing and owning property. All right. But we're saying the consequential damages can't be medical. Let's say, again, they go to France to pull the check out and they say, this is because I'm going to invest in Florida real estate. Would you say then that that makes it more or less likely to have a direct effect in France? The downstream intention of where to spend the dollars? Your Honor, what I was pointing out is that the DOWs have more vested in the United States than someone who just happens to be on vacation in France and tries to deposit a check. So the direct effect is because U.S. citizens, U.S. residents who were entitled to their money in the U.S. didn't get it. It's the quintessential direct effect. Had BDL sent the money, the DOWs would have had their 18 point... But we have said, just to go back to my point to you earlier, we've said over and over again, the refusal to pay in the United States with someone who wants to be paid in the United States, whether it be a debt or, in this case, money from a bank, we've said, is not a direct effect. We've said that more than once. You don't have any response to that, right? Your Honor, here, the check remittances on them said for deposit in the U.S. All right. Thank you. You have three minutes for rebuttal. Thank you, Your Honor. And looks like Mr. Berger, on behalf of the ELC Bank and Credit Libanese. Your Honor, Mitchell Berger for AM Bank. Oh, I'm sorry. With the Board's permission, we scrambled the order a little bit. Okay, that's fine. No problem. AM Bank. Go ahead, Mr. Berger. So as to AM Bank, plaintiffs concede that the form selection clause in their contract with the bank is presumptively enforceable under three of the four prongs of this court's Martinez test. They concede that the form selection clause is mandatory. They concede it's exclusive of courts other than the courts of Beirut. And they concede that it covers this dispute. They argue only that enforcement of that mandatory, exclusive, fully covering form selection clause is unreasonable because of the personal safety concerns to which Mr. Major alluded and because, although he really didn't address this much, what they say is the likely denial of any effective remedy due to the corrupt influence on the courts and the banking sector. So let's start with first principles, if I may. Under this court's decision in S.K. Beer v. Baltica Brewery, the unreasonableness test requires extraordinary circumstances and it's narrowly interpreted. It imposes a very heavy burden on the plaintiffs. They do not meet that as to AM Bank for two reasons, primarily. Number one, they didn't even open an account with AM Bank until December of 2019, two months after the crisis is fully blown and in effect in Lebanon. And there's been no material change in circumstances since that time. You heard their response to that. Their response to that is that the money was already frozen. They were out of options at that point. Why isn't that a legitimate response? It's a factual response. It has nothing to do with whether enforcement of a clause they voluntarily signed when they chose to move their money locally from one Lebanese bank to another and saying, if I have a dispute with you, I will litigate it in the courts of Beirut. Interestingly, you know, he talks about the fact that Mr. Major talks about the fact that, well, we were told we could get money out and that's why we moved our bank from C.L. to AM Bank. But the fact is they don't even challenge the forum selection clause on grounds of fraudulent inducement. They have waived that. Their brief in pages 35 to 36 says we're challenging it on only two grounds. Number one, I'm afraid for my safety. Number two, the courts are corrupt. They do not have a fraudulent challenge to this provision they voluntarily signed. Maybe they didn't think they had a choice. Maybe they thought after being turned down by two other Lebanese banks that the third time was going to be the charm and that they would get money out from AM Bank. Okay. Well, when they couldn't, what they were obliged to do was litigate that dispute in Beirut. And here's the thing. They never even tried to litigate in Beirut. They come into this court and they say, I'm afraid. The courts are corrupt. You would think that to do that, they should have at least tried to litigate this dispute in Beirut. And they know that that's the reason why they didn't try. It's because both their declarations and our declarations say that many depositors who have similar claims are litigating safely in the courts of Beirut. They may not like the result, but they are litigating safely in the courts of Beirut. You can take a look, for example, at their declarations. It's the Appendix 986 to 990, the Torby Declaration, makes clear that many depositors are able to obtain counsel and to litigate safely and often successfully in the courts of Beirut. And that doesn't stand alone. The banks put in other declarations. So you have Torby on their side, but you have the El Sher Declaration at pages 1743 to 44 of the Appendix, the Sumerani Declaration at pages 1761 through 64 of the Appendix, and you have the Professor Diab Declaration at pages 768 to 72 of the Appendix. Lots of people are litigating similar disputes in the courts of Beirut, but they don't become unenforceable because you think you can't win. That's not the point of forum nonconvenience as enforced through a forum selection clause. It's do you get an effective remedy, which I suppose takes us to their personal safety and corruption arguments, on which I'll touch briefly. Everything about their personal safety argument is either non-particularized to them, and I think Judge Bianco mentioned, or maybe it was Judge Nardini mentioned, that these threats found by others in the Florida case have nothing to do with them, but more particularly, as the district court found here, these are entirely post hoc assertions. They are not particularized, and to the extent they're particularized, they're entirely hearsay. So the district court was well within its discretion to disregard that evidence. Second, on the so-called corruption of the courts, the affidavits that I cited from the Appendix belie that concern. They show the courts are F-3rd and 499 said a corruption claim in the forum nonconvenience context requires, quote, a complete absence of due process, and the affidavits put the lie to that. So unless the court has any questions, we would ask that the dismissal as to A.M. Bank be affirmed. All right. Thank you. Looks like number two is Mr. Rottenberg. Good morning, Your Honor. Jeff Rottenberg from DLA Pfeiffer for BLC Bank and Credit Libanese. As with A.M. Bank, Judge Cote dismissed BLC on forum nonconvenience grounds based on the mandatory forum selection clauses in its agreement with appellants. I think for the reasons Mr. Berger just explained, there's no reason why the clause in the BLC agreement should be disregarded here. With regard to Credit Libanese, Judge Cote found that personal jurisdiction was lacking under New York's long-form selection. Before you get into that, can I just ask you a question? Isn't the issue of personal jurisdiction really the same with respect to BLC? Sure. So BLC is an alternative grounds for dismissal as to BLC would be personal jurisdiction. There's no factual distinction in terms of what their transactions were with I think one had three over the course of their relationships, one had four. I think at both banks the last transaction was in 2018 or so. Okay. So that's correct, Your Honor. All right. So Judge Cote found both that the transaction of business prong and the substantial nexus prong was lacking when it came to personal jurisdiction as to Credit Libanese. I think it's important to mention that under the New York well-armed statute, personal jurisdiction has to be established as to it's not just that there's a claim and there's personal jurisdiction and therefore every complaint, every claim in the complaint, every cause of action in the complaint is therefore subject to the jurisdiction of this court. And I think in that way it's important to break down what exactly is alleged, how the correspondent accounts fit in, and what exactly the contract between the parties says. The issue here is really the arising under, right? I mean the district court was wrong to say there need to be multiple transactions of business because the New York statute is clearly a one-shot statute. If you make only one transaction in New York and it's a fraudulent transaction in some way and the claim is directly related to that transaction, New York would assert long-arm jurisdiction. You're right, Your Honor. It is true New York is a single-act state. So what we're really focused on here is the arising under, right? I do think it's worth, but I will switch to arising. So the arising point, the contracts between the parties don't say anything about New York. They don't say anything about correspondent accounts. And Judge Coates saw and assessed him a substantial nexus prong, and it is a substantial nexus prong. The standard is not permissive, and not to be overly cute, but the cases say relatively permissive. It's not a permissive standard. It's a serious standard. The New York statute says arising from. It doesn't say relate to. Some of the due process cases in the federal courts, including the Supreme Court, talk about relate to. That's a means arising from. It means the causes of action, the individual causes of action, the elements of those cause of actions have to be tethered to the correspondent account activity. And Judge Coates found that was not the case for reasons I think, I apologize, one of Your Honor's mentioned, which was the acts here, the decisions here relevant to this lawsuit all took place in Lebanon. The correspondent account activity predated the claims arising by several years. The claims arise from the financial crisis in Lebanon, decisions made in Lebanon during that crisis, and really the case boils down to whether or not, and Judge Coates said this, whether or not the appellants are entitled to withdraw money under their contracts in U.S. dollars as they deem fit, both contractually and under the circumstances under the present situation in Lebanon. What about their argument that representations were made to them? They cited I think a declaration that these correspondent accounts that they would be paid in New York. What's your response to that? Sure. Even if it wasn't in the contract, I guess. Right, exactly. So I mean my first, thank you, Your Honor. My first part of that answer would be these are contractual claims and the obligations of the parties that are under the contract. A promise to do something under a contract is not a fraud. It's a promise to perform. If they fail to perform under the contract, that's a contractual issue that should be decided elsewhere under Lebanon law. As to the fraud, again, the allegations are that transactions were not made, for one thing, and I think Your Honor speaked up on that in questioning Mr. Major and Mr. Berger. The transactions that did not occur cannot give rise to long-arm jurisdiction because there are no transactions to give rise to long-arm jurisdiction under the statute. But how do you make of the fact that the claim of this being a Ponzi scheme, it's sort of a whole scheme that they had in mind, right? Didn't they allege that basically they suckered the money in by making these representations related to the correspondent accounts and then in the end when they tried to take the money out, they wouldn't let it go. So what do you do when they allege this as being a scheme where basically the inflows and the lack of outflows aren't strictly entwined as part of a scheme, at least as alleged? As alleged, right. Well, first, I mean, putting aside the fact that in our papers below, we explain why that was not adequately alleged. If you review the record here, you'll see transactions come in, transactions come out. Credit Libanese, for example, pulled all their money, excuse me, appellants pulled all their money out of Credit Libanese in the summer of 2018. That doesn't sound like a Ponzi scheme. There are other means of transacting through the banks. There are checks, as we talked about earlier. The issue is they don't send, it's not that the banks retain the funds. The banks are perfectly happy to let them have the funds, just not in the United States. Right. And that's because of what is going on now in Lebanon. And it started to go on in Lebanon in around October, November, December 2019. Correct. The banks are not making out here. The banks are managing a serious financial crisis in Lebanon where they're working to try and treat all customers equitably. Money goes to this person. The money is not going to go to this person. The banks are trying to manage the process that has unfortunately developed to no one's best interests towards the end of 2019. All right. Thank you. Okay. We have Ms. Schultz now. May it please the court. Linda Goldstein for Banque du Liban, the central bank of Lebanon. It's undisputed that plaintiffs themselves have no commercial relationship with the central bank. The only commercial relationship alleged in the complaint is relationship between all Lebanese banks and the Banque du Liban. Plaintiffs' claims are not based on the commercial relationship between the central bank and local Lebanese banks because their claims have nothing to do with that relationship. It doesn't matter to their claims whether the CL, AM bank or BCL loaned money to the central bank, loaned money to local Lebanese businesses or bought treasury bills with it. It has nothing to do with their claims. It's not the gravamen of their claims. Furthermore, the only act that is alleged to have been committed by the central bank in connection with the commercial relationship with the commercial banks is giving the commercial banks checkbooks holding printed checks that said payable in Beirut. It was the commercial banks that issued those checks and drew those checks and gave them to the plaintiff in response to their requests for their money. Plaintiffs try to obscure this by saying that it was the central bank that drew the checks. You heard that here just now. But Judge Cote held at page 19 of her decision that it was the commercial banks, CL, AM and BLC, that both issued and drew the checks. That's a central fact that the plaintiffs have not challenged on this appeal, have not claimed it's erroneous in any way. And several important facts flow from that factual finding. One, the gravamen of plaintiffs' claims is not any commercial activity by the central bank because it was a contractual obligation. Checks were a contractual obligation flowing from them to the plaintiffs, not from the central bank. Second, it precludes any finding that an act by the central bank had a direct effect in the United States. Again, it was commercial banks that signed checks and delivered them to the plaintiffs, allegedly telling them that they could be deposited in the United States, notwithstanding the fact they say on their face that they're payable only in Beirut. It was then the plaintiffs who sought to deposit them in the United States. These independent acts by the commercial banks and by the plaintiffs themselves mean that any effect of non-payment on the plaintiffs is not direct under Weltover and under this court's precedence. Even if we were to take the non-act of the central bank in not paying the checks, that would not suffice to establish the commercial relationship either. There are two reasons for that. One, the non-payment on the checks is not a legally significant act. The central bank had no obligation to pay the plaintiffs. The central bank only had a contractual obligation to the commercial banks. If I can draw an analogy, if the commercial banks had instead of giving plaintiffs checks drawn on the central bank, had given them checks drawn on Bank of America and they only had 7 cents in their account instead of $7 million and they said to the plaintiffs, here, here's your money, here's a check for $7 million. And plaintiffs tried to deposit that and Bank of America said, no, we're not paying that check. There's insufficient funds to pay that check. They don't have a claim against Bank of America. They have a claim against the bank that gave them the check that had insufficient funds to back it. Here, it's the same situation. There's no legally significant effect of any non-payment by the central bank because the central bank had no obligation to pay the plaintiffs, period. And more specifically, had no obligation to pay in the United States because the check on its face says payable in how I understood Judge Coates' findings to be. That is to say that this was, these checks were essentially the same as the checks that I get from Citibank in a checkbook and that I write to draw against my account at Citibank. And I thought that was what you just said is this relationship and that's what I had understood. You said that wasn't challenged. It was challenged here today. But are you saying there's never been an argument and I don't remember one? It's not in the briefs that there was some claim that this was a clearly erroneous fact finding. These are really cashier's checks issued directly to the Dows by the Bank of Lebanon. Correct. They are not cashier's checks. They are checks just like you have at Citibank except in this case if Citibank would put on something that said payable only in New York. That's the only distinction here. And it's an important distinction for the direct effect test because the act has to connect, an act of the bank, of the central bank has to be connected to their... Yeah, I mean I guess there's something ambiguous though about payable only in Beirut. I mean my checks for Citibank don't say payable only in New York, but ultimately when the money flows all around, Citibank pays it presumably in New York. But it's not payable, it doesn't say cashable only or depositable only. There's something distinct about Lebanon which is in the record and it's explained in the initial declaration and the reply declaration of Fadimo Geisel and it's also for that matter explained in the declaration of plaintiff's expert, El Khoury. At paragraph 47 of the El Khoury declaration, that's plaintiff's expert, she says that if a check drawn on the central bank is deposited overseas, then a correspondent has to take that to Lebanon where the central bank, where it basically is cleared in due course in Lebanon. In Lebanon, the central bank maintains a clearing system whereby checks that are deposited, including checks drawn on BDL, are cleared through this internal system. The only members of that system are banks that are either domestic Lebanese banks or foreign banks that are authorized to do business in Lebanon. And so payment can only be made through that system. And that's the whole problem here really, isn't it? That there is a sovereign act, whoever did it, whether the central bank does it in its sovereign capacity or some other Lebanese authority does, that is trying to keep the dollars in Lebanon. And that's what this is all about. That is part of it, Your Honor, although the fact that the check says payable in Beirut and it can only be paid in Beirut, that was true before the financial crisis and it's true now. To the extent that plaintiffs are alleging that the central bank has been involved in efforts to maintain levels of foreign reserve currency in Lebanon, that plainly is a sovereign act and not actionable. All right. Thank you. If the Court has no further questions, we rest on our brief. Thank you. Mr. Major, you have three minutes in rebuttal. Thank you, Your Honors. Just to pick up on the payable in Beirut point, there are facts in this record which demonstrate that that is distinct from deposit, as Your Honor was pointing out, because we talked earlier about the checks that were deposited or the check that was deposited with AM Bank in December of 2019. And this is in the record. That check was deposited in the city of Junier, not in the city of Beirut. Beirut is not Lebanon. So it showed that the payable in Beirut is distinct from where you can deposit the check. That just tells the bank that receives the check on deposit where to go get the money, which is exactly what happened here when the checks were deposited. Bottom line is there is no contractual provision that it's payable in the United States, period, right? There's no contractual provision that says this must be paid in the United States. If that were the situation, it would be a completely different record, right? Is that the bottom line, or am I missing something? The commercial banks clearly had the commercial obligation, and the bank, once it issues the check... You're trying to sue the Lebanese bank, right? It counts three, and I believe it's four, of our complaint. Those are claims on the checks themselves, not on an independent contract. You can have a contract claim, and you can have a separate claim on a check that is improperly dishonored. So we have a contract on the check itself. The check is a negotiable instrument, and if it's not paid, there are ramifications for it. With respect to the fact that the central bank, although the governor of the central bank has claimed there are no such capital controls, and we put that in the record, it's not the purpose behind the act. It's the act itself. You look at the act, which is this check, as they acknowledge themselves on the defense side, the check was a commercial banking relationship. The only thing the central bank had to do was wire funds, which is an everyday banking activity. It doesn't matter that it may have had a purpose of hoarding dollars within its borders. With respect on the personal jurisdiction issue, the reason Lychee focused on the number of transactions, because there you had a bank that was processing transactions on behalf of the terrorists, and what the court held was one or two transactions might just be a mistake or an accident or something they don't notice. Right, but we've already established, no one's disputing, I think at this point, that the New York statute only requires a transaction, but it has to be a transaction from which the cause of action arises. So the question is, what does that mean? What's the nexus? How substantial does it have to be? That's the focus. It's not a question anymore about the number of transactions. Thank you, Your Honor. With that, unless the panel has any questions, I'll rest on our briefs. I think we're good. Thank you very much, Your Honor. Thank you to both sides, and we will reserve decision. The last case, as I mentioned, is on submission, Marvin V. Peldunas, and with thanks to Ms. Molina, our courtroom deputy, I would ask her to adjourn court.